### JAMES G. BROWN
### v.
### FREDERICK W. KRAUSE ET AL.

*Trust Deeds—Foreclosure—Cross-Bill—Cancellation— Fraud—Rescis-
sion.*

In a proceeding to foreclose a trust deed, upon a review of the evidence,
this court affirms the decree of the court below, granting relief on the cross-
bill for the cancellation of the trust deed as procured by false and fraudulent
representations in the sale of a plantation in Texas, the consideration being
the notes secured.

[Opinion filed March 13, 1889.]

Appeal from the Superior Court of Cook County; the Hon. Egbert Jamieson, Judge; presiding.

Messrs. Wise & Davis and Frederic Ullmann, for appellant.

What is the law regarding the rescission of a contract by the parties?

In Harrison v. Polar Star Lodge, 116 Ill. 287, the court says: "Any circumstances or course of conduct from whence can be clearly deduced an agreement to put an end to the original contract, will amount to a rescission of it."

In Mix v. White, 36 Ill. 487, our Supreme Court says: To have that effect, evidence should be reasonably clear and definite, and, at least, satisfy the mind that such was the intention of the parties."

In Huffman v. Hummer, 18 N. J. Eq., p. 90, the court says: "But such parol waiver or discharge must be clear and explicit, and proved beyond doubt." The minds of both parties must agree to make a contract, and the proof must be clear to establish it; so in a rescission or abandonment of the contract the minds of the parties must meet and the proof must be equally clear that both parties intended to rescind or abandon it. We submit has Krause, by a preponderance of the evidence, proved that the parties rescinded the contract?

We contend that there were, as a fact, no false or fraudulent representations—no rescissions; but supposing there were false and fraudulent representations made to induce him to purchase the land, and remembering that Krause went on the plantation in April, 1884, and remained there over one year before he returned to Chicago, according to his present story he knew of the fraud nearly all the time, yet never tendered a deed reconveying to Brown, China Grove plantation. What is the law?

Bigelow on Fraud, p. 421, Ed. 1888: "In case real property has been conveyed to the injured party, it is not enough to tender back the conveyance, for that would not restore the

·title to the former owner; the grantee should tender a recon-
veyance. A mere offer in the case of an exchange of lands
to ' trade back ' would, therefore, be insufficient." The learned
author, on the same page, holds that the same rule applies to
infants and married women.

In Jeffrey v. Forbes, 28 Kan. 179, which was a case of
extreme hardship, the court uses this language : " Now, the
rule is, that when parties seek to set aside a conveyance on the
ground that it is fraudulent, they must restore, or offer to
restore, all they have received under it. A party who has
received certain consideration, no matter how small and inade-
quate, for any contract or conveyance, must return that con-
sideration, or offer to return it, before he is entitled to have
the contract or conveyance set aside. He can not, while retain-
ing the benefit of the transaction, repudiate it as null and void;
and the plaintiffs in this case should tender a reconveyance of
the forty. acres as a condition of recovery."

In Wilbur v. Flood, 16 Mich. 45, Brewer, J., uses this
language: " A mere offer to trade back is no rescission of a
contract. The party aggrieved must do what he can to place
the other in *statu quo*, and when it is possible this can only be
done in cases like the present by a return or tender of a return
of what he has received in exchange for what he has given.
In the case of land this can only be done by a conveyance."

Our Supreme Court, in Smith v. Brittenham, 109 Ill. 551,
uses this language: " In such a case it is a misapprehension
to suppose that the right to return exists when both parties
can not be placed in *statu quo*. To take the land from Smith
and give it to Mrs. Brittenham, and give him, in lieu of the
goods, a certain sum of money, such as a court or jury might
think he was entitled to by way of compensation for his goods,
would be, in effect, compelling him to sell his goods on terms
he never consented to, and would not, in any legal sense, be a
rescission of the contract. It would lack the essential element
of mutuality. Compensation, as we understand it, has no place
in the law of rescission. When property has been exchanged,
as in the present case, it must be restored in kind, otherwise
there can be no rescission; and if the injured party is unable

to do this, by reason of having sold or otherwise disposed of what he had received under the contract, or any substantial part of it, he is simply in no position to ask a rescission."

Krause never tendered a deed of China Grove; he did not pay his note and interest when due; the land was duly and legally advertised and sold under the trust deed, Krause entering no protest, no objection to the sale, and taking no legal steps to prevent it. The property is sold and conveyed by the trustee, thus divesting Krause of any interest in China Grove. Not having any interest in China Grove, how can he reconvey? It may be claimed that Brown became the purchaser; what of it? The sale was legal and proper and divested the title. Krause having no longer the title is in no position to rescind. If he ever had any such right, which we can not believe under the evidence, he lost it by his negligence.

In Wilbur v. Flood, the court uses this language: "It is an inflexible rule that a party complaining of fraud must be guilty of no unreasonable delay in repudiating and getting rid of his contract. When his object is to rescind it and reclaim his property, he is bound to lose no time unnecessarily in his action to that end. While no particular period can be laid down in all cases, yet it is quite well settled that no unnecessary delay can be permitted, and in the absence of some proof to excuse it, any considerable lapse of time must be *conclusive* evidence of neglect."

Our Supreme Court, in Cox v. Montgomery, 36 Ill. 398, uses this language: "Still this species of remedy must be invoked with reasonable diligence. In a country where the values of real estate change as rapidly as in Illinois, it would be clearly unwise to permit a purchaser of land to retain it nearly eighteen months after the discovery of the fraud before filing a bill to rescind. This is an unreasonable delay, which a court of chancery can not tolerate." It was much longer than this before the cross-bill was filed in this case.

In Elder v. Sabin, 66 Ill. 130, the court says: "Having received the deed and gone into possession without taking the necessary steps to secure the use of water from the well on the adjoining lot, and having held the property for almost seven

months, it must be held that the application comes too late to have the sale set aside, and the deed, notes and mortgage canceled. * * * Such delay and want of promptness on their part are, in the opinion of a majority of the court, strong evidence of a waiver of that part of the agreement, or at least as showing insufficient grounds to rescind the contract."

Messrs. John N. Jewett and Jewett Bros., for appellees.

It is a well settled rule in law that the contracting party has a right to rely upon the statements of the vendor. In the case of Mead v. Bunn, 32 N. Y. 275, this principle is clearly stated:

"Every contracting party has an absolute right to rely on the express statement of an existing fact, the truth of which is known to the opposite party and unknown to him, as the basis of a mutual engagement. * * * And he is under no obligation to investigate and verify statements, to the truth of which the other party to the contract, with full means of knowledge, has deliberately pledged his faith." See also McClellan v. Scott, 24 Wis. 81; Converse v. Blumrich, 14 Mich. 108.

If one makes false representations, whether knowingly or not, upon which another, relying on them, acts to his injury, he is bound to make them good. Smith v. Richards, 13 Pet. 26–44.

A party selling property is presumed to know whether his representations are true or false. If he knows them to be false, it is fraud; but if he does not know them to be false, he is guilty of gross negligence, which is legal fraud. 6 Vesey, 180, 189.

"When one has made a false representation, knowing it to be false, the law infers that he did so with an intention to deceive. And where one has made a representation, positively, or professing to speak as of his own knowledge, without having any knowledge of the subject, the intentional falsehood is disclosed and the intention to deceive is also inferred." Shepley, J., in Hammitt v. Emerson, 27 Me. 308, 326.

"We take it to be a settled rule," say the court, per Shaw, C. J., in Hazzard v. Erwin, 18 Pick. 95, at page 104, "that in

Brown v. Krause.

the case of a false and fraudulent representation by a vendor in matter of fact, within his own knowledge, or which he affirms to be within his own knowledge, not as to matters of opinion, judgment, probability or expectation, in a matter essentially affecting the interests of the other party, a matter in which he reposes confidence in such affirmation, and is in fact deceived by it, the party thus deceived may repudiate and rescind the contract at his election."

If a party makes an untrue statement, and has at the time no knowledge of its truth, and even has no belief in its truth, he is chargeable with fraud, in equity as well as in law. Making a statement which the party does not believe to be true is only slightly removed in culpability from the making a statement which the party knows to be false. 2 Pomeroy Eq. Jur., 371; Cabot v. Christie, 42 Vt. 121; Fisher v. Miller, 103 Mass. 503.

A party guilty of fraudulent conduct shall not be allowed to cry "negligence" as against his own deliberate fraud. Linington v. Strong, 107 Ill. 295; Hale v. Philbrick, 42 Iowa, 81; Matlock v. Tod, 19 Ind. 130; Starkweather v. Benjamin, 32 Mich. 305.

In calling the court's attention to these decisions, we desire to emphasize the fact that Mrs. Josephine M. Krause, as appears from the testimony, did not reach China Grove plantation until the last of April, 1884; that she had been there scarcely two months when she died; that the opportunity for discovering the falseness of the representations was never accorded her, and that her children, nearly all being minors, were not bound by any doctrine of *laches.*

GARY, J.   The appellant filed his bill against Frederick W. Krause, and the children of said Krause and his deceased wife, Josephine M., the children being her heirs-at-law, to foreclose a deed of trust in the nature of a mortgage made by her with her husband upon her property, to secure the payment of promissory notes made by Frederick W. for the principal part of the purchase money of a Texas plantation, sold to him by the appellant.   There were other defendants, but nothing in the case is affected by that circumstance.

The appellees filed a cross-bill for the cancellation of the notes and deed of trust, upon the charges that the sale was procured and Mrs. Krause induced to make the deed of trust by false and fraudulent representations made by appellant as to the character of the plantation, and that afterward, by mutual consent, the whole transaction was rescinded. The sale of the plantation was in March, 1884. In April the Krause family moved to it, and in June she died there.

On the question of fraud, while the testimony of Frederick W. Krause and his son, Frederick F. Krause, is justly subject to the severe criticism of the appellant's counsel, because of the alleged inconsistency between it, and their silence as to any misrepresentations during all the residue of the year 1884 after their arrival at the plantation and knowledge of its real character, yet it is so strongly supported by collateral circumstances and intrinsic probability, that, at least with some allowance for exaggeration always attending strong feeling, it ought to be taken as a true history of the interview between the appellant and Mrs. Krause. It is not necessary that the evidence in the case should be repeated, or even summarized at much length. It is hardly disputable that, as a fact in the case, the plantation itself was such a one as no prudent mother would consent, with knowledge of what it was, to take her family to; that not merely as a business enterprise was the purchase foolish, but as a home the plantation was wholly unfit for a family caring for health and accustomed to the ordinary comforts of life. There is but little evidence in this record as to her capacity, but that little is strongly in her favor. The appellant put in evidence a great many letters written by F. W. Krause. October 22, 1883, in relation to a contract for the purchase, which he had made a few days before, but which was afterward abandoned, he writes:

"You will remember I told you, when here, I hardly ever make a contract without sleeping over it, and to get it right. Deviating from this resolve has caused me sleepless nights and regrets in this case ever since my return from St. Louis. When I returned to my house and explained to my wife what I had done, she exclaimed with surprise, and a pale countenance,

You risk all we have in this enterprise.   That will never do ! ' and upon due reflection I must admit she is right."

October 19, 1884, in another of those letters, he says: " In the stillness of the night I can not suppress my tears and bewail my misfortune, but among the memories of my departed wife, the most prudent, sagacious and industrious woman which ever honored Texas with footsteps, I found this : ' Complain not of thy woes to the public; they will not more pity thee than the hunters of prey pity the wounded deer.' "

The many letters of Krause show him to have been of a very ardent disposition.   That after a life of thirty-five years in a machine shop here in the north, he had become infatuated with the idea of an open air life, in a warmer climate. He visited the plantation in August, 1883, but, as it would seem, made very little examination of it, and that little with a mental incapacity to see any defects that should hinder the indulgence of his desire to live in the south.   But she saw nothing of the plantation until she went there to die.   The appellant testifies that before the sale of the plantation he was one evening at the residence of Krause for an hour and a half, and saw his wife and children, and he admits that there was conversation; that they " talked the subject over, and about the climate.   Never spoke about the condition of the house on the plantation.   We talked about everything; all sorts of subjects; the question as to whether it was a place for a residence of his family was not seriously talked of at the time." And again he says: " I told him generally as to the actual condition of things;" but whether that is meant to refer to the evening visit, does not appear.

The appellant thinks this was in November, 1883.   F. W. Krause says December 4th, and F. F. about December 1st. Now, why did the appellant go to the house of Krause at all ? The only reasonab'e explanation, there being no previous acquaintance, is, that Mrs. Krause was yet hesitating or object-ing to the purchase.   But leaving the purpose out of view, the undisputed fact in the case is, that the appellant spent an hour and a half, as he says, about three hours, as F. W. and F. F. Krause say, at the house of Krause, in conversation to

which she was a party, when the topic most absorbing to her was, whether she should consent to a purchase, far beyond their means, of a Texas plantation, and with her children, go there to live, and when the only subject mutually interesting to the appellant and the Krause family was, whether that purchase should be made. Under such circumstances the conversation must have been, as the Krauses say it was, upon the subject of mutual interest.

They say that she did not wish to complete the purchase without further examination by the father or son, or both, but that appellant dissuaded her from that as a needless expense, assured her of the truth of his statements and praised the place and enumerated its good qualities, extolling it as a paradise of comfort, luxury and health. Upon these representations she made the deed of trust. In her lifetime she would not have been, since her death her heirs are not, bound by it.

' While it may be presumed that F. W. Krause did tell his wife what he saw in visiting the plantation in August, 1883, yet his description must have been of such a place as his hopes and desires made it. It is not credible that with a true picture of it before her, she would have consented to the pledge of all that her family had in the world for the' purchase of such a place as the evidence shows this to have been. The charge of fraud, upon which, without reference to the subsequent rescissions, Mrs. Krause in her lifetime, and her heirs since her death, are entitled to be relieved from the deed of trust, is amply sustained, and her silence and acquiescence, and that of her children, is excused by her brief life and their infancy.

F. W. Krause, as well as his son, testifies that he took to the plantation machinery and a saw-mill of the value, or in his words, which "inventoried," $10,000. And they both testified that in November, 1884, Mr. Dodd, who was the senior partner of the firm of Dodd, Brown & Co., to whom at the time of the sale to Krause the plantation belonged, the title being, it seems, in Brown for the firm, came to the place, and by agreement then made between Krause and Dodd, Krause

Brown v. Krause.

abandoned everything he had upon the plantation, made a bill of sale to Dodd, Brown & Co. of the sugar and molasses of the crop of 1884, and that Dodd accepted this abandonment and bill of sale as a rescission of the relations between them. Dodd denies the rescission, but his recollection of the incidents of his visit to the plantation at that time seems to be very vague. That he took the bill of sale, he admits. That Krause left the place, with his machinery upon it, is not denied. Dodd saw the machinery but has no explanation of why it was left. He simply denies that there was any agreement for a rescission. That in equity and good conscience there ought to have been a rescission, is a fair deduction from all the facts in the case. If there was one, it was not carried into execution by proper papers. Krause stayed until spring and finished and shipped the crop, which he says was part of his agreement. Dodd admits that Krause agreed that, as he could not continue any longer to conduct the place, he would turn it back, but he says that was to be done in pursuance of the original contract, which contained a provision, upon special terms, for such a contingency.

It is difficult to reconcile all the conduct of either party with the version of either, and it is not altogether satisfactorily established that as to the notes themselves the parties ought not to be left to their remedies and defenses at law. The notes, however, seem to be of little value if separated from the deed of trust. The personal obligations of a man in the last ten years of the three score and ten, bereft of all property, are not very valuable. The real substance of the controversy is the deed of trust. The decree, as a whole, will therefore be affirmed.

*Decree affirmed.*